IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

Case No.: 1:21-CV-23545-CIV-ALTONAGA/TORRES

EDWARD MENDEZ

    Plaintiff,

v.

T-MOBILE USA, INC.

    Defendant.
_____/

**DEFENDANT'S MOTION TO COMPEL ARBITRATION
AND INCORPORATED MEMORANDUM OF LAW**

Pursuant to 9 U.S.C. §§ 3 and 4, Defendant T-Mobile USA, Inc. d/b/a "Metro by T-Mobile" ("Metro") hereby respectfully moves this Court to enter an Order: (i) compelling arbitration of Plaintiff Edward Mendez's claims asserted in the Verified Complaint (ECF No. 1), as required by his arbitration agreement with Metro; and (ii) staying this litigation until arbitration is complete.

## I.     INTRODUCTION

Plaintiff Edward Mendez alleges Metro failed to prevent third-party hackers from accessing his pre-paid phone service and ultimately using that access to steal Bitcoin and other cryptocurrencies held on third-party accounts and platforms with nothing to do with Metro. (Complaint ("Compl."), ECF No. 1, ¶¶ 57, 73-76.) Based on these allegations regarding the unauthorized use of his Metro line of service, Mr. Mendez asserts claims for violation of the

Federal Communications Act; negligence; gross negligence; negligent hiring, retention, and supervision; and violations of the federal Computer Fraud and Abuse Act. (*See id.* ¶¶ 102-167.)[1]

Mr. Mendez is contractually required to bring his claims in arbitration. On several occasions over a period of years, Mr. Mendez consented to Metro's Terms and Conditions ("T&Cs") and thereby agreed to arbitrate any disputes with Metro. In particular, the industry-standard T&Cs provide for the arbitration of "any and all claims or disputes in any way related to or concerning" Metro's services, privacy policies, or devices. (*See* Decl. of Hope Norris filed concurrently ("Norris Decl.") ¶ 33 (case changed).) Although Metro's T&Cs give customers the right to opt out of arbitration, Mr. Mendez did not do so. (*Id.* ¶ 39.) Instead, he continuously used and benefited from Metro's service and assented to the arbitration provision on multiple occasions. (*Id.* ¶¶ 7-10, 20, 23-28, 31-32.)

To the extent Mr. Mendez disputes, e.g., the enforceability or scope of the arbitration provision, that dispute goes to the arbitrator to decide, as the parties agreed. But in any event, the arbitration agreement plainly covers the claims Mr. Mendez brings against Metro based on its alleged failure to protect Mr. Mendez's account from hacking by third parties. Those claims arise directly from Metro's provision of telecommunications services, Mr. Mendez's service agreements with Metro, and Metro's privacy policy regarding dissemination of customer account information.

The Court should therefore compel Mr. Mendez to arbitrate his claims against Metro and stay this action pending completion of that arbitration.

---

[1] Mr. Mendez's attorney filed a similar action against Metro in this Court in the case captioned *Frye v. T-Mobile USA, Inc.*, No. 0:21-cv-61653-KMM. Metro filed a motion to compel arbitration in that case based on the same arbitration agreement generally applicable to Metro customers on October 12, 2021. The Motion remains pending before the Honorable K. Michael Moore.

## II.   FACTUAL BACKGROUND

Defendant Metro by T-Mobile offers prepaid wireless phone plans to more than 18 million customers at industry-leading rates.  (Norris Decl. ¶ 2.)  Plaintiff Mendez is a Metro customer with a Metro wireless services account (the "Mendez Account").  (*Id.* ¶ 5.)

On or about August 19, 2021, Mr. Mendez alleges that third-party "hackers" redirected calls and messages to his phone number to a different device, without his authorization.  (Compl. ¶¶ 58-63.)  He claims the hackers leveraged their access to his Metro line of service to find his passwords on third-party websites, and access his third-party bank and cryptocurrency accounts.  (*Id.* ¶¶ 64-71.)  He seeks to recover $238,924.21 in cryptocurrencies that he allegedly lost based on the hack.  (*Id.* ¶ 77.)

As Mr. Mendez concedes, he "entered into a contract with Metro" on August 5, 2010.  (Compl. ¶ 10.)  In particular, Mr. Mendez opened his Metro account on August 5, 2010, and activated a line of service with a number ending in 8915 with Metro on June 6, 2012.  (Norris Decl. ¶¶ 5, 7.)  At the time of activation, Mr. Mendez agreed to service with Metro and was provided with information about Metro's T&Cs.  (*Id.* ¶¶ 10, 20, 23, 27.)  The T&Cs contain a mandatory arbitration agreement.  (*Id.* ¶¶ 32-34.)

Since his initial activation, Mr. Mendez has not only continued to use his Metro device but has upgraded the device several times, including on November 1, 2018, November 16, 2020, and December 28, 2020.  (Norris Decl. ¶ 9.)  The T&Cs advise customers that they agree to be bound to the T&Cs in any of a number of ways, including by activating service, by using service, or by paying for service.  (*Id.* ¶ 29.)  By activating, using, and paying for Metro service, Mr. Mendez agreed to be bound by Metro's T&Cs and the arbitration clause therein.  (*Id.* ¶ 30.)

The arbitration agreement—to which Mr. Mendez agreed—is featured prominently in the T&Cs in bold lettering.  Under the heading "**HOW DO I RESOLVE DISPUTES WITH METRO BY T-MOBILE?**" the March 2021 Terms and Conditions state: "By accepting these T&Cs, you are agreeing to resolve any dispute with us through binding arbitration or small claims dispute procedures (unless you opt out), and to waive your rights to a jury trial and to participate in any class action suit."  (Norris Decl. ¶ 32.)  Consistent with this notice, the T&Cs prominently disclose and explain the arbitration obligation as follows:

> **Dispute Resolution and Arbitration. YOU AND WE EACH AGREE THAT, EXCEPT AS PROVIDED BELOW, ANY AND ALL CLAIMS OR DISPUTES IN ANY WAY RELATED TO OR CONCERNING THE AGREEMENT, OUR PRIVACY NOTICE, OUR SERVICES, DEVICES OR PRODUCTS, INCLUDING ANY BILLING DISPUTES, WILL BE RESOLVED BY BINDING ARBITRATION OR IN SMALL CLAIMS COURT.**  This includes any claims against other parties relating to Services or Devices provided or billed to you (such as our suppliers, dealers, authorized retailers, or third-party vendors) whenever you also assert claims against us in the same proceeding. You and we each also agree that the Agreement affects interstate commerce so that the Federal Arbitration Act and federal arbitration law, not state law, apply and govern the enforceability of this dispute resolution provision (despite the general choice of law provision set forth below). THERE IS NO JUDGE OR JURY IN ARBITRATION, AND COURT REVIEW OF AN ARBITRATION AWARD IS LIMITED. THE ARBITRATOR MUST FOLLOW THIS AGREEMENT AND CAN AWARD THE SAME DAMAGES AND RELIEF AS A COURT (INCLUDING ATTORNEYS' FEES) … .

(*Id.* ¶ 34.)

Metro makes customers aware of this dispute resolution provision through a variety of means.  For example, when a customer purchases a new phone from Metro, he receives a one-page sheet explaining Metro's return and upgrade policies, highlighting important aspects of Metro's T&Cs, and providing the web address for the full T&Cs (the "Metro Information

4

Sheet"). (Norris Decl. ¶¶ 20-22, Ex. H.) The Metro Information Sheet includes a section entitled "Metro Terms and Conditions," and the first line of this section reads in bold print:

> **By activating or using Metro Service, you agree to the Metro Terms and Conditions of Service. Metro requires Arbitration of Disputes unless you opt-out within 30 days of activating. Details and the full version can be viewed at metropcs.com/terms.**

(*Id.* ¶ 21.)

Furthermore, at all relevant times to the present, Metro's system automatically has sent all Metro customers a short message service ("SMS") or text message as a reminder of their monthly payment eight days prior to the due date. (Norris Decl. ¶ 26.) The message references Metro's T&Cs, the arbitration agreement in particular, and includes a link that directs the customer to the T&Cs. (*Id.*) The message reads: "[Account #]: Please pay $[amount due] by [due date] to avoid service interruption. Metro by T-Mobile Terms & Conditions including arbitration apply. See mbyt-mo.com/terms." (*Id.*)

In addition, each Metro device, such as a new phone, comes in a box with a sticker (the "Metro Box Sticker") on the outside that must be removed before the box can be opened. (Norris Decl. ¶ 23.) The Metro Box Sticker references Metro's T&Cs and the applicability of the arbitration provision. (*Id.* ¶ 24 ("By purchasing or opening this package, activating, using, or paying for Metro by T-Mobile service, you agree to the Metro by T-Mobile Terms and Conditions ('T&Cs') which provide for arbitration of disputes and waivers of class actions and jury trials.").) It also directs customers to the full T&Cs on Metro's website and instructions on how to opt out of the arbitration agreement. (*Id.*) According to Metro's records, Mr. Mendez received Metro devices that would have been sealed by the Metro Box Sticker on at least three occasions: when he upgraded on November 1, 2018, November 16, 2020, and December 28, 2020. (*Id.* ¶ 25.)

Moreover, when a customer purchases a new device from Metro, he receives a text message notifying him of the T&Cs and directing him to the website containing the T&Cs. (Norris Decl. ¶ 27.)  Metro sent Mr. Mendez a link to the then-current T&Cs via SMS text message to his phone number ending in 8915, in both Spanish and English, on November 1, 2018, November 16, 2020, and December 28, 2020.  (*Id.* ¶¶ 28.)  The T&Cs also appear on Metro's website and prominently feature the agreement to arbitrate disputes.  (*Id.* ¶ 38.)

Although the T&Cs provided Mr. Mendez the opportunity to opt out of arbitration, he did not do so.  (Norris Decl. ¶¶ 35, 39.)  Mr. Mendez regularly uses his Metro phone and service and pays for his account, evidencing his assent to the terms that govern his usage.  (*Id.* ¶¶ 30, 31.)

### III.     ARGUMENT AND AUTHORITIES

The Federal Arbitration Act ("FAA") applies to the Metro T&Cs because, by definition, a contract for telecommunication services affects interstate commerce.  *See* 9 U.S.C. §§ 1-2; *Mehler v. Terminix Int'l Co. L.P.*, 205 F.3d 44, 47 (2d Cir. 2000); *see generally Goldberg v. Sweet,* 488 U.S. 252, 254-55 (1989) (telecommunications industry constitutes interstate commerce).  Moreover, the FAA applies because the contracts between Metro and Mr. Mendez are contracts between citizens of different states. (Compl. ¶¶ 3-4.)  Contracts between citizens of different states affect commerce, rendering the FAA applicable.  *Kong v. Allied Prof. Ins. Co.,* 750 F.3d 1295, 1303 (11th Cir. 2014).  The T&Cs' choice-of-law provision also explicitly states that the FAA governs the agreement.  (Norris Decl., Ex. A at PDF p. 13; *id.*, Ex. B at PDF p. 2; *id.*, Ex. C at PDF p. 3; *id.*, Ex. D at PDF p. 2; *id.*, Ex. E at PDF p. 2; *id.*, Ex. F at PDF p. 4; *id.*, Ex. G at PDF p. 2.)  *See Preston v. Ferrer*, 552 U.S. 346, 353 (2009) (applying FAA's procedural rules pursuant to choice-of-law clause).

Under the FAA, written agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Congress passed the FAA to "reverse the longstanding judicial hostility to arbitration agreements" and "to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991). The goal was "to ensure the enforcement of arbitration agreements according to their terms." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 334 (2011). An "emphatic federal policy … favor[s] … arbitral dispute resolution." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985).

"[T]he FAA requires a court to either stay or dismiss a lawsuit and to compel arbitration upon a showing that (a) the plaintiff entered into a written arbitration agreement that is enforceable 'under ordinary state-law' contract principles and (b) the claims before the court fall within the scope of that agreement." *Lambert v. Austin Ind.*, 544 F.3d 1192, 1995 (11th Cir. 2008). When an arbitration provision satisfies both conditions, the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (citing 9 U.S.C. §§ 3, 4). As explained below, both conditions are satisfied here. The Court should direct Mr. Mendez to arbitrate his claims against Metro.

Even if there were any doubt that the agreements are enforceable (which there is not), the Court should interpret any ambiguity in favor of enforcement. "The principal purpose of the FAA is to ensur[e] that private arbitration agreements are enforced according to their terms." *AT&T*, 563 U.S. at 344. The FAA both "embod[ies]" and declares a "national policy favoring arbitration." *Id.* at 346. The Supreme Court has interpreted the FAA as reflecting both "a liberal federal policy favoring arbitration, and the fundamental principle that arbitration is a matter of

contract." *Id.* at 333.  "In line with these principles, courts must place arbitration agreements on an equal footing with other contracts, and enforce them according to their terms." *Id.* at 339.

To further the FAA's purposes, the Supreme Court has emphasized that courts should interpret arbitration clauses liberally in favor of arbitration.  "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24-25 (1983).  The Supreme Court has instructed that courts should "move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible." *Preston*, 552 U.S. at 357.  "A prime objective of an agreement to arbitrate is to achieve streamlined proceedings and expeditious results." *AT&T,* 563 U.S. at 346.

The Supreme Court has consistently recognized this strong public policy in favor of arbitration. *See, e.g.*, *Am. Express Co. v. Italian Colors Rest.,* 133 S. Ct. 2304, 2308-09 (2013); *AT&T,* 563 U.S. at 339.  Florida law is in accord:  "Florida public policy favors resolving disputes through arbitration when the parties have agreed to arbitrate." *Maguire v. King,* 917 So. 2d 263, 266 (Fla. Dist. Ct. App. 2005), *approved sub nom. Jackson v. Shakespeare Found., Inc.,* 108 So. 3d 587 (Fla. 2013).

  A. **Mr. Mendez Should Be Compelled to Arbitrate His Claims.**

    1. **Courts Regularly Enforce Metro's Arbitration Agreement.**

Courts across the country, including this Court, have repeatedly enforced Metro's arbitration agreement with customers like Mr. Mendez. *See, e.g.*, *Williams v. MetroPCS Wireless, Inc.,* 2010 WL 1645099 (S.D. Fla. 2010); *MetroPCS Communications, Inc. v. Porter,* 273 So.3d 1025 (Fla. Ct. App. 2018); *Cuadras v. MetroPCS Wireless, Inc.*, 2011 WL 227591 (C.D. Cal. 2011); *Gittins v. MetroPCS Texas, LLC,* 2017 Tex. App. LEXIS 11597 (Tex. Ct. App. 2017); *Smith v. T-Mobile USA, Inc.*, 2018 WL 1933695 (D.S.C. 2018); *Smith v. T-Mobile USA, Inc.*, 2018 WL 1939501 (D.S.C. 2018).  Moreover, courts routinely enforce the nearly identical

arbitration agreement for T-Mobile customers with the T-Mobile brand. *See Ozormoor v. T-Mobile, USA, Inc.*, 354 F. App'x 972, 975 (6th Cir. 2009) (holding T-Mobile's arbitration clause was not unconscionable and compelling arbitration of plaintiff's claim); *Mohammad v. T-Mobile USA, Inc.*, 2018 WL 6249910, at *4 (E.D. Cal. Nov. 29, 2018) (finding arbitration clause not procedurally or substantively unconscionable; enforcing arbitration in SIM-swap case); *Meyer v. T-Mobile USA, Inc.*, 836 F. Supp. 2d 994, 1003 (N.D. Cal. 2011) ("the arbitration agreement is not procedurally unconscionable"); *Owings v. T-Mobile USA, Inc.*, 978 F. Supp. 2d 1215, 1225 (M.D. Fla. 2013) ("Not only does the Service Agreement incorporate T-Mobile's Terms & Conditions of service, which include a detailed arbitration provision, the Service Agreement itself put Plaintiff on notice that arbitration of any disputes involving T-Mobile was mandatory if Plaintiff did not timely opt-out."); *McGinnis v. T-Mobile USA, Inc.*, 2009 WL 4824002, at *8 (W.D. Wash. Dec. 9, 2009) (holding T-Mobile's mandatory arbitration provision valid and enforceable); *Destinations by Design, LLC v. T-Mobile USA, Inc.*, 2010 WL 1687752, at *8 (S.D. Ohio Apr. 26, 2010) (granting T-Mobile's motion to stay litigation and compel arbitration as to all of plaintiff's claims). Indeed, the Supreme Court's seminal case on consumer arbitrations enforced a substantially identical arbitration clause used by AT&T, another wireless carrier. *See AT&T*, 563 U.S. at 333.

Here, Mr. Mendez agreed to resolve his disputes with Metro through streamlined, cost-efficient arbitration using the AAA, the nation's leading provider of arbitration services, and this Court should enforce that agreement.

### 2. Mr. Mendez Agreed to Be Bound by the Metro Arbitration Agreement.

"[I]n determining whether a binding agreement arose between the parties, courts apply the contract law of the particular state that governs the formation of contracts." *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1369 (11th Cir. 2005). Here, Florida law controls

9

the issue since Mr. Mendez is a resident of Florida and uses his Metro service in Florida. (*See* Compl. ¶¶ 3, 7; *see, e.g.*, Hope Decl. Ex. D at PDF p. 13 ¶ 26 (governing law includes FAA and law of state of customer's address).)

Contract formation under Florida law requires "offer, acceptance, consideration and sufficient specification of essential terms." *St. Joe Corp. v. McIver*, 875 So. 2d 375, 381 (Fla. 2004). "A valid contract—premised on the parties' requisite willingness to contract—may be 'manifested through written or spoken words, or inferred in whole or in part from the parties' conduct.'" *Kolodziej v. Mason*, 774 F.3d 736, 741 (11th Cir. 2014) (quoting *L & H Constr. Co. v. Circle Redmont, Inc.*, 55 So. 3d 630, 634 (Fla. Dist. Ct. App. 2011)).

Here, Mr. Mendez's Verified Complaint concedes that he "entered into a contract with Metro." (Compl. ¶ 10.) As Metro's records confirm, in securing his Metro wireless services, Mr. Mendez repeatedly agreed to arbitrate his disputes with Metro during the parties' years-long and continuing relationship. Mr. Mendez accepted the arbitration agreements in the T&Cs when he first activated, used, and paid for his device. (Norris Decl. ¶¶ 8-9, 29-31.) He also received the Metro T&Cs on numerous occasions, including when he first initiated service and received the T&Cs as well as the Metro Information Sheet, and on November 1, 2018, November 16, 2020, and December 28, 2020, when Metro sent Mr. Mendez a link to the T&Cs by SMS text message in both Spanish and English. (*Id.* ¶¶ 10, 20, 28, Ex. H.) Although he had an opportunity to opt out of the arbitration provision, he chose not to. (*Id.* ¶¶ 35, 39.) Instead, he used Metro's device and service based on Metro's T&Cs, thereby agreeing to the arbitration provision of the T&Cs if a dispute arose regarding those services.

In addition to activating, using, and upgrading his device, Mr. Mendez also manifested his agreement to arbitrate disagreements with Metro by continuously paying for his device and

10

service. Each month, Mr. Mendez received a text message from Metro reminding him to pay his bill and referring to the T&Cs and arbitration agreement. (Norris Decl. ¶ 26.) And Mr. Mendez made numerous payments on his account, including payments for service on June 6, 2012, the day Mr. Mendez opened his line of service, and on November 2, 2018, November 16, 2020, and December 28, 2020, all within one day of account upgrades. (*Id.* ¶ 30.) Metro's records show that from September 2020 to August 2021, Metro received at least fourteen different payments to the Mendez Account. (*Id.* ¶ 31.) Through his payments to Metro, Mr. Mendez reaffirmed his commitments to arbitrate any disputes with Metro involving his phone line, which Metro provided to him at industry-leading rates based on the terms reflected in its T&Cs.

### B. Mr. Mendez's Claims Are Subject to Arbitration.

#### 1. The Agreement Delegates Questions on Arbitrability to the Arbitrator.

The Court should compel Mr. Mendez to arbitrate based on his enforceable promise to do so. There are no further issues to be decided by the Court. Indeed, even if Mr. Mendez contests whether his claims are subject to arbitration, the parties agreed to delegate all gateway or threshold questions of arbitrability to the arbitrator, and that delegation is enforceable.

"When the parties' contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision as embodied in the contract." *Henry Schein, Inc. v. Archer & White Sales, Inc.,* 139 S. Ct. 524, 528 (2019). Here, the parties agreed to arbitrate pursuant to the AAA or JAMS rules, and those rules likewise delegate gateway issues to the arbitrator. In particular, Metro's T&Cs expressly state that arbitration will be held pursuant to AAA (or previously JAMS) arbitration rules. (*See* Norris Decl., Ex. A at PDF p. 13; *id.*, Ex. B at PDF p. 2; *id.*, Ex. C at PDF p. 3; *id.*, Ex. D at PDF p. 2; *id.*, Ex. E at PDF p. 2; *id.*, Ex. F at PDF p. 4; *id.*, Ex. G at p. 3.) AAA's rules provide that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity

of the arbitration agreement or to the arbitrability of any claim," and that "[t]he arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part." (Decl. of James H. Moon ("Moon Decl.") filed concurrently, Ex. A (AAA Consumer Arbitration Rules) R-14; *id.*, Ex. B (AAA Commercial Arbitration Rules) R-7.) Likewise, JAMS rules provide that the "Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter," "including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought." (Moon Decl., Ex. C (JAMS Arbitration Rules) Rule 11; *id.*, Ex. D (JAMS Streamlined Rules) Rule 8.)

When an arbitration provision states that arbitration shall be conducted pursuant to AAA or JAMS rules, courts consistently hold that the arbitration provision has made a clear and unmistakable delegation of arbitrability issues to an arbitrator: "[W]e read an arbitration agreement incorporating [arbitral] rules containing [delegation] language as clear and unmistakable evidence that the parties ... intended to delegate questions of arbitrability to the arbitrator." *JPay, Inc. v. Kobel*, 904 F.3d 923, 938 (11th Cir. 2018); *see also Larsen v. Citibank FSB*, 856 F. App'x 238, 245 (11th Cir. 2021); *Gorelik v. Dillion*, 2010 WL 11553317, at *5 (S.D. Fla Dec. 15 2010) ("The Eleventh Circuit has found that when … an arbitration agreement incorporates (by reference) arbitration rules providing the arbitrator the authority to rule on his or her own jurisdiction, including the validity and scope of the arbitration provision, the parties 'clearly and unmistakably' agreed that the arbitrator—and not a court—should decide issues pertaining to arbitrability.") (citing *Terminix Int'l Co., L.P. v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327, 1332 (11th Cir. 2005)); *Fellype v. Citibank, N.A.*, 2020 U.S. Dist. LEXIS 247521, at *16 (S.D. Fla. Nov. 6, 2020) (finding clear designation based on incorporation of AAA or JAMS rules).

"In th[e]se circumstances, a court possesses no power to decide the arbitrability issue." *Schein*, 139 S. Ct. at 529. Indeed, "as the Supreme Court recently ruled, even in instances where the argument in support of arbitrability is wholly groundless, the threshold issue of arbitrability nonetheless must be decided by the arbitrator, not the Court, if the contract delegates the arbitrability question to an arbitrator." *Carnevali v. Yardley Car Co.*, 452 F. Supp. 3d 1321, 1325 (S.D. Fla. 2019) (citing *Henry Schein*, 139 S. Ct. 524).

Thus, because the parties delegated arbitrability issues to the arbitrator pursuant to the arbitral bodies' rules, the Court need not go beyond a determination that Mr. Mendez entered into an agreement to arbitrate. Instead, the Court should compel arbitration and allow the arbitrator to resolve any purported issues of arbitrability. *See Henry Schein*, 139 S. Ct. at 529.

### 2. Mr. Mendez's Claims Fall Within the Broad Scope of the Agreement.

In any event, even though analysis of the scope of the arbitration agreement should be left to the arbitrator as required by *Henry Schein*, there can be no question that Mr. Mendez's claims fall within the scope of Metro's arbitration clause. The mandatory arbitration provision to which Mr. Mendez agreed is broad, applying to "**ANY AND ALL CLAIMS OR DISPUTES IN ANY WAY RELATED TO OR CONCERNING THE AGREEMENT, OUR PRIVACY NOTICE, OUR SERVICES, [OR] DEVICES OR PRODUCTS.**" (Norris Decl. ¶ 33.) Mr. Mendez's claims fall directly within the scope of the arbitration clause because they relate to or concern his Metro account and Metro's devices and products. Indeed, Mr. Mendez's claims rest on Metro's alleged failure to safeguard his phone account and service, including a claim that it honored an unauthorized request for a SIM card, which allegedly allowed third-party fraudsters to access the line of service Metro provided to Mr. Mendez. (Compl. ¶¶ 102-167.) As pled, these claims, including the statutory claims, arise directly and exclusively from Metro's services,

13

privacy policy, and products. Thus, Mr. Mendez's claims fall within the scope of the arbitration agreement as they relate to his account with Metro and Metro's products, devices, and services.

### C.    The Action Should Be Stayed Pending Arbitration.

The FAA provides that once satisfied that the suit should be moved into arbitration, a court "*shall* on application of one of the parties *stay the trial of the action*." 9 U.S.C. § 3 (emphasis added). As a result, when a plaintiff asserts claims within the scope of an enforceable arbitration agreement, as Mr. Mendez's claims are here, "the court should order that the action be stayed pending arbitration." *Bender v. A.G. Edwards & Sons, Inc.,* 971 F.2d 698, 699 (11th Cir. 1992). Because Mr. Mendez should be made to arbitrate his claims, the Court should stay this action pending completion of arbitration.

## IV.    CONCLUSION

For the reasons stated herein, Mr. Mendez contractually agreed to arbitrate his claims rather than pursuing them in court. Accordingly, Metro respectfully requests that this Court grant its Motion to Compel Arbitration and stay this case in favor of arbitration.

### CERTIFICATE OF GOOD-FAITH CONFERENCE

Pursuant to Local Rule 7.1(a)(3)(B), the undersigned counsel for Metro has conferred with all parties or non-parties who may be affected by the relief sought in the motion in a good-faith effort to resolve the issues raised in the motion and has been unable to do so.

    Respectfully submitted,

    DAVIS WRIGHT TREMAINE LLP

    By: /s/ *Matthew R. Tuchman*

        Matthew R. Tuchman
        Florida Bar No. 109297
        DAVIS WRIGHT TREMAINE LLP
        1301 K Street NW, Suite 500 East
        Washington, D.C. 20005

(202) 973-4200 Phone
(202) 973-4499 Fax

James H. Moon (*pro hac vice*)
Matthew C. Onyett (*pro hac vice* forthcoming)
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, Suite 2400
Los Angeles, CA 90017
Tel:  (213) 633-6819
Fax:  (213) 633-6899

*Attorneys for Defendant T-Mobile USA, Inc.
d/b/a Metro by T-Mobile*