**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No.: 1:21-cv-23545-CMA**

**EDWARD MENDEZ,**

       **Plaintiff,**

**v.**

**T-MOBILE USA, INC.**

       **Defendant.**
_____/

**PLAINTIFF'S PETITION TO VACATE ARBITRATION AWARD**

Now comes, Plaintiff Edward Mendez ("Mendez"), by and through the undersigned counsel, hereby files this Petition to Vacate Arbitration Award. In support thereof, Plaintiff states as follows:

**INTRODUCTION**

Plaintiff Edward Mendez seeks to vacate the April 24, 2024 Arbitration Award issued by Arbitrator Laura Reich of Harper Meyer, LLP, which ruled in favor of T-Mobile, USA, Inc. (the "Defendant"). The Arbitrator, operating under the Federal Arbitration Act (the "FAA") through the American Arbitration Association ("AAA"), exceeded her power by determining that a contractual limitation of liability clause overrides statutory remedies provided by the Federal Communications Act ("FCA"). In the alternative to vacatur, Plaintiff proposes that this Court adjudicates the federal claim independently.

The Florida Supreme Court has ruled that contracts that contravene statutory rights or public policy are unenforceable. This principle extends to the substance of contracts, not just arbitration clauses. Arbitrator Reich's verdict effectively abrogates an act of Congress. Congress requires cellular telephone companies to protect the privacy and security of Consumer Privacy Network Information (CPNI) and to protect the networks that contain this information, which T-Mobile admittedly breached in this instance.

Under 47 U.S.C. § 206, Plaintiff has a private right of action in federal court for compensation to those who are damaged by a carrier's violation of the FCA. There is no legal basis for an arbitrator to discard an injured party's statutory remedies because a telecommunication company dictates it by contract.

In the final Closing Brief, filed on March 26, 2024, claimant argued the following: limitation of remedies or limitation of liability provisions that directly contravene specific statutory remedies are unenforceable. Specifically, contracts that violate federal statutes are illegal and unenforceable. *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72 (1982) ("[I]llegal promises will not be enforced in cases controlled by the federal law.").

Accordingly, T-Mobile's contract of adhesion is illegal and unenforceable because Congress, under 47 U.S.C. § 206, mandates that a common carrier "shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this Act, together with a reasonable counsel or attorney's fee[.]" Hence, this Court should vacate the arbitration award because an arbitrator cannot deny a statutory cause of action created by Congress based on a contractual limitation-of-liability clause.

After more than two years of arbitration, Arbitrator Laura Reich issued a two-page Final Award. *See* the Final Award attached hereto as **Exhibit "A."** Therein, she completely refused to consider T-Mobile's violations of the FCA in reliance of the limitation-of-liability clause within T-Mobile's Terms and Conditions. If the terms and conditions completely barred any claims for relief, there was no reason to hold the final hearing. The Arbitrator could have spared the Plaintiff two years of unnecessary distress. However, without the three-day hearing, the Arbitrator would not have been paid $7,500.00 from T-Mobile. Alas, in arbitration the business directly pays the arbitrator and AAA directly.

In this instance, the Arbitrator disregarded the testimonies of law professor Mark Rasch and cybersecurity expert Allison Nixon, the only two expert witnesses presented at final hearing.[1] The Arbitrator fed into the systemic corruption that T-Mobile has continuously benefitted from: the FAA's enforcement of arbitration agreements disproportionately favors large corporations. The confidentiality veil of arbitration also makes it increasingly difficult for attorneys to advocate for their clients without a transparent body of law to rely on.

Arbitrator Reich did not reference the federal statutes in her order because T-Mobile's terms and conditions specified that they only provided phone service so she rationalized that there was no need to consider any of Edward Mendez's arguments. She exceeded her power in doing so. Accordingly, this verdict should be vacated.

## JURISDICTIONS, PARTIES, VENUE

1.  This Court has jurisdiction under 28 U.S.C. 1332 because the parties are citizens of different state the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

---

[1] T-Mobile did not tender any expert witnesses.

2. This Court has jurisdiction under 28 U.S.C. § 1331 because the claim under the Federal Communications Act raises a question of federal law.

3. At all times material hereto, Plaintiff Mendez is a citizen of Miami-Dade County, Florida.

4. At all times material hereto, Defendant T-Mobile USA, Inc. ("T-Mobile") is incorporated in the State of Delaware with the principal place of business in the State of Washington.

## FACTUAL AND PROCEDURAL BACKGROUND

5. On August 19, 2024, Edward Mendez was Sim Swapped. His Metro PCS device suddenly was dead. His phone number was transferred to a third-party hacker.[2] Immediately following the Sim Swap, the hacker, via SMS text verification, was able to reset the password of Mr. Mendez's Coinbase account and then transferred $238,924.21 out of Mr. Mendez's account.[3]

6. On September 9, 2021, T-Mobile sent his wife, Roxana Mendez, a letter acknowledging Edward Mendez's CPNI had been illegally accessed by an unauthorized user twice on August 19, 2024.  Weeks later, he received another letter that bad actors illegally gained access to his CPNI again. *See* the Letters attached hereto as **Exhibit "B**." CPNI is protected by federal statute and T-Mobile in these letters acknowledged it was illegally accessed.

7. On October 7, 2021, Plaintiff filed his Complaint in this Court. Plaintiff alleged T-Mobile's failure to protect Mr. Mendez's account information allowed hackers to conduct an illegal SIM swap and steal cryptocurrency worth $238,924.21 at the time of the loss.

8. On December 6, 2021, T-Mobile filed its Motion to Compel Arbitration.

9. On January 10, 2022, this Court granted the Motion, sent the matter to arbitration, and dismissed the suit without prejudice. In doing so, this Court held that it was up to an arbitrator to determine whether Plaintiff's claims against T-Mobile were subject to arbitration.

---

[2] Metro PCS is a subsidiary of T-Mobile.
[3] The Bitcoin lost is worth far more than $238,924.21 at the time of this filing.

10. On December 6, 2022, Arbitrator Laura Reich issued the Interim Order Determining Arbitrability, concluding that Plaintiff's claims were subject to arbitration. The Arbitrator's reasoning rested on two grounds: (a) that by activating service with Metro (subsequently acquired by T-Mobile), Plaintiff agreed to Metro's Terms and Condition, which includes an Arbitration Clause; and (b) the claims asserted by Plaintiff were within the scope of the arbitration agreement.

11. In compliance with the Order, Plaintiff filed his Statement of Claim with the AAA, asserting the following: Count I - Violation of the Federal Communications Act; Count II - Negligence; Count III - Gross Negligence; Count IV - Negligent Hiring, Retention and Supervision; Count V - Violations of the Computer Fraud and Abuse Act; and Count VI - Breach of Contract.

12. After more than two years of arbitration, the final hearings took place from February 13, 2024 through February 15, 2024 (hereto, see February 13, 2024 transcript as **Exhibit "C")**[4]**.**

13. In its post hearing brief, T-Mobile provided Arbitrator Reich with past arbitration results that they had won. All Arbitrator Reich did was follow the road map presented by T-Mobile, which she did. Arbitrator Reich was also selected as the arbitrator for T-Mobile in at least one other Sim Swap case.

14. Arbitrator Reich told counsel for T-Mobile off the record that she would like to be an arbitrator full time, but she still worked at her firm.

15. One sure fire way to secure full-time work as an arbitrator is to rule in favor of the businesses that are repeat clients, which is exactly what happened in this instance.

---

[4] The other transcripts are requested to file under seal.

**MEMORANDUM OF LAW**

### I.  Legal Standard

By statues, "It is only when [an] arbitrator strays from interpretation and application of the agreement and effectively dispense[s] his own brand of industrial justice 'that his decision may be unenforceable. In that situation, an arbitration decision may be vacated under § 10(a)(4) of the FAA on the ground that the arbitrator exceeded [his] powers, for the task of an arbitrator is to interpret and enforce a contract, not to make public policy." *Stolt-Nielsen S. A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671-72 (2010) (internal citations omitted); *see also Major League Baseball Players Assn. v. Garvey*, 532 U.S. 504, 509 (2001) (per curiam).

An arbitration award may also be vacated if enforcement of the award is contrary to public policy. *See Delta Air Lines, Inc. v. Air Line Pilots Ass'n*, 861 F.2d 665, 671 (11th Cir.1988); *United States Postal Serv. v. National Ass'n of Letter Carriers*, 847 F.2d 775, 777 (11th Cir.1988).

### II.  The Arbitration Award was Obtained in Direct Contradiction with the Legislative Intent behind the Federal Arbitration Act and the Federal Communications Act

"The FAA was enacted in 1925 in response to widespread judicial hostility to arbitration agreements." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (citing *Hall Street Associates, L. L. C. v. Mattel, Inc.*, 552 U.S. 576, 58 (2008). Section 2 of the FAA is considered the "primary substantive provision of the Act." *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.*, 460 U.S. 1, 24, (1983). Section 2 provides,

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid,

irrevocable, and enforceable, save upon such grounds as exist at law or in equity
for the revocation of any contract[.]

9 USCS § 2 (emphasis added). This provision reflects "a liberal federal policy favoring arbitration," *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.,* 460 U.S. 1, 24 (1983), and the "fundamental principle that arbitration is a matter of contract," *Rent-A-Center, West, Inc. v. Jackson,* 561 U.S. 63, 67, 130 S. Ct. 2772, 2776, 177 L. Ed. 2d 403, 410 (2010).

Because arbitration is a matter of contract, the main legal issue here concerns whether a contract can override and limit liabilities arising from a private cause of action enacted by Congress under an independent federal statutes—namely 47 U.S.C. § 206.

As a threshold matter, it is not an absolute that all claims are arbitrable even when policies do favor arbitration. There is a distinction between statutory claims and contractual claims. As succinctly reasoned in *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 647-57 (1985), Justice Stevens emphasized the following points: (1) the informal procedures of arbitration, "so desirable in the context of contractual disputes are inadequate to develop a record for appellate review of statutory questions" when (2) "[s]uch review is essential on matters of statutory interpretation in order to assure consistent application of important public rights; (3) "a decision by Congress to create a special statutory remedy renders a private agreement to arbitrate a federal statutory claim unenforceable;" and (4) most importantly, "[i]nstead of 'muffling a grievance in the cloakroom of arbitration,' the public interest in free competitive markets would be better served by having the issues resolved 'in the light of impartial public court adjudication.'"

Plaintiff will address each of these consideration in the context of the Federal Communications Act and the result obtained in arbitration.

1. **Statutory Interpretation and Statutory Remedies**

Plaintiff has a private cause of action against T-Mobile for violations of the FCA. Section 206 of the Federal Communications Act expressly provides:

> In case any common carrier shall do, or cause or permit to be done, any act, matter, or thing in this Act prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this Act required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this Act**,** together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery, which attorney's fee shall be taxed and collected as part of the costs in the case.

47 U.S.C. § 206 (emphasis added). Section 207, in turn, provides that "Any person claiming to be damaged by any common carrier subject to the provisions of this Act […] may bring suit for the recovery of the damages for which such common carrier may be liable under the provisions of this Act, in any district court of the United States of competent jurisdiction[.]" 47 U.S.C. § 207.

All of T-Mobile's violations were addressed in the Closing Brief, but completely disregarded without any reasoning by the arbitrator. In fact, the Arbitrator's analysis began with "Claimant contracted with Respondent for a phone plan; he did not contract with Respondent to provide him with Internet security or to secure his cryptocurrency assets." *See* Final Award, p. 1. T-Mobile's duty to safeguard Plaintiff's CPNI and report breaches, while not found on the face of the contract, are expressly provided for by federal statutes.

What happened here—a total disregard of protected rights—is exactly what Justice Stevens discussed in *Mitsubishi*. An arbitrator is not equipped with adequate experience, knowledge, or power to interpret statutes that impact public rights.

There is a trend in the federal circuits to recognize that a cellphone user has property and privacy interests in their CPNI. The United States Supreme Court suggested that CPNI could be protected property interest under the Fourth Amendment:

> Our case offers a cautionary example. […] But 47 U. S. C. §222 designates a customer's cell-site location information as "customer proprietary network

information" (CPNI), §222(h)(1)(A), and gives customers certain rights to control use of and access to CPNI about themselves. The statute generally forbids a carrier to "use, disclose, or permit access to individually identifiable" CPNI without the customer's consent, except as needed to provide the customer's telecommunications services. §222(c)(1). It also requires the carrier to disclose CPNI "upon affirmative written request by the customer, to any person designated by the customer." §222(c)(2). Congress even afforded customers a private cause of action for damages against carriers who violate the Act's terms. §207. **Plainly, customers have substantial legal interests in this information, including at least some right to include, exclude, and control its use. Those interests might even rise to the level of a property right.**

*Carpenter v. United States*, 585 U.S. 296, 406 (2018) (J. Gorsuch, dissenting) (emphasis added).

Justice Gorsuch's cautionary example has now played out with damaging consequences to the unassuming Plaintiff. Justice Gorsuch succinctly stated, "Today we use the Internet to do most everything. Smartphones make it easy to keep a calendar, correspond with friends, make calls, conduct banking, and even watch the game. Countless Internet companies maintain records about us and, increasingly, *for us*. Even our most private documents—those that, in other eras, we would have locked safely in a desk drawer or destroyed—now reside on third party servers." *Id.* at 387.

Plaintiff is not seeking this Court's review of arbitrability of the statutory claims or his privacy or property interests at this point of the proceedings—he is, however, seeking this Court's holding that the Arbitrator was without power and beyond her depth to disregard statutorily protected rights. Vacatur is appropriate in this scenario because the Arbitrator exceeded her power in attempting to adjudicate, then ultimately disregard federal statutes, which impact public rights.

In accordance with *Carpenter*, these rights could rise to the level of constitutionally protected property and privacy rights. While as a threshold matter, this Court did delegate gateway questions to an arbitrator—and Arbitrator Reich did decide that the claims were subject to arbitration—none of these decisions conclusively dispel Plaintiff's entitlement to recover damages under 47 U.S.C. § 206.

A search in the Eleventh Circuit and sister federal circuits of this Court has not revealed a body of law addressing a cellphone user's property and privacy interest in their CPNI. First, this supports the position that the Arbitrator did not have any legal basis to disregard Plaintiff's protected interests and private cause of action under 47 U.S.C. § 206. Second, there is also no legal basis granting the Arbitrator power to deny Plaintiff's the remedies created by Congress.

Citing to an Order issued by the Federal Communications Commission, the State of California emphasized, "Customers, however, have proprietary and privacy interests in their CPNI and for this reason may seek to restrict access to their CPNI." *See California v. FCC*, 39 F.3d 919 (9th Cir. 1994) (citing *Order on Remand,* 6 F.C.C.R. at 7607, 7611). Indeed, the Federal Communications Commission acknowledged that "The CPNI rules for enhanced services were intended to balance considerations of efficiency, competitive equity, and privacy." 6 FCC Rcd 7571.

"In light of the FCA's protection of CPNI, courts have recognized that telecommunications customers have a privacy interest in CPNI." *See e.g., Ross v. AT&T Mobility, LLC*, No. 19 cv-06669-JST, 2020 U.S. Dist. LEXIS 166298 (N.D. Cal. May 14, 2020); *People of State of Cal.*, 39 F.3d at 930 (noting that customers "have proprietary and privacy interests in their CPNI"); *ICG Commc'ns, Inc. v. Allegiance Telecom*, 211 F.R.D. 610, 612-15 (N.D. Cal. 2002) (noting that 47 U.S.C. § 222 "was principally intended to protect consumer's privacy interests"); *U.S. West, Inc. v. FCC*, 182 F.3d 1224, 1236 (10th Cir. 1999) ("[T]he specific and dominant purpose of § 222 is the protection of customer privacy."); *National Cable & Telecoms. Ass'n v. FCC*, 555 F. 3d 996 (DC Cir., 2009) (Section § 222 imposes **a duty** common carrier to protect customers' proprietary information).

The FCC has recently reaffirmed a common carrier's fundamental duty to protect customers' CPNI. *See* Protecting Consumers from SIM-Swap and Port-Out Fraud, 88 FR 85794 (2023) ("To ensure that wireless providers adapt their security practices on an ongoing basis to address evolving techniques used by bad actors to commit SIM swap fraud, we take this opportunity to remind all telecommunications carriers of their statutory duty to "protect the confidentiality of proprietary information of, and relating to . . . customers," and their **continuing preexisting legal obligation** to "take reasonable measures to discover and protect against attempts to gain unauthorized access to CPNI.").

The FCC's adoption of more regulations to protect CPNI evidences a continuing effort and expanding public policy to ensure cellphone users are not left victimized by SIM swaps and frauds. Of note, the FCC imposes an obligation on carriers, like T-Mobile, "to proactively and regularly review and monitor their policies and procedures to ensure that they continue to be effective at addressing evolving fraud techniques against customer accounts and services—including SIM swap and port-out fraud—and to conduct analyses of fraud incidents to determine how the fraud occurred and implement measures to prevent such tactics from being successful again in the future." *Id.*

Arbitrator Reich exceeded her power in not analyzing or reviewing federal statutes in sole reliance on a contractual limitation of liability clause. As delineated above, this result contravenes clear public policy in imposing a fundamental duty on carriers to protect consumers' CPNI—damages arising from which would entitle a consumer to a private cause of action. The fact that T-Mobile provided other verdicts with the same unfavorable result against consumers supports the position that, unless vacatur is ordered, federal statues and FCC regulations are meaningless.

## 2. Unenforceable Private Agreement and Limitation of Liability

As recent as 2022, the Supreme Court upheld the conclusion that the FAA "does not require courts to enforce contractual waivers of substantive rights and remedies" in *Viking River Cruises, Inc. v. Moriana*. 596 U.S. 639, 653 (2022). The Court explained:

> The FAA's mandate is to enforce *arbitration agreements*. And as we have described it, an arbitration agreement is a specialized kind of forum-selection clause that posits not only the situs of suit but also the procedure to be used in resolving the dispute**. An arbitration agreement thus does not alter or abridge substantive rights; it merely changes how those rights will be processed. And so we have said that by agreeing to arbitrate a statutory claim, a party does not forego the substantive rights afforded by the statute; it only submits to their resolution in an arbitral ... forum.**

*Id.* (citing *Mitsubishi*, 473 U.S. at 633) (emphasis added); *see also Brooklyn Savings Bank v. O'Neil,* 324 U.S. 697 (1945) (holding that statutory rights especially those intended to protect the public interest, generally cannot be waived by private agreements); *Barrentine v. Arkansas-Best Freight System, Inc.*, 450 U.S. 728 (1981) (emphasizing that private contracts cannot override statutory rights when such rights are grounded in public policy).

As relevant here, the *Viking* court also noted, "It is that the FAA requires only the enforcement of 'provision[s]' to settle a controversy 'by arbitration,' §2, and **not** any provision that happens to appear in a contract that features an arbitration clause." *Id.*, n.5. Meaning, not only did the Arbitrator erroneously discard Plaintiff's statutorily protected right, she did so using the Limitation of Liability clause which is not a part of the arbitration agreement. This clause of the contract, contrary to what the Arbitrator believed, does not act as a waiver of Plaintiff's protected rights under the FCA.

In the Closing Brief, Plaintiff asserted that limitation of remedies or limitation of liability provisions that directly contravene specific statutory remedies are unenforceable. Specifically, contracts that violate federal statutes are illegal and unenforceable. *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72 (1982) ("[I]llegal promises will not be enforced in cases controlled by the federal

law."). The Florida Supreme Court has held that limitation-of-remedies-provisions preventing the arbitration panel from awarding punitive damages violated public policy. See *Shotts v. OP Winter Haven, Inc.*, 86 So. 3d 456, 465-471 (Fla. 2011) (relying on federal precedents for guidance); *Gessa v. Manor Care of Fla., Inc.*, 86 So. 3d 484 (Fla. 2011) ("the limitations of remedies provisions in the present case violate public policy, for they directly undermine specific statutory remedies created by the Legislature."). "No valid agreement exists if the arbitration clause is unenforceable on public policy grounds." *Global Travel*, 908 So.2d at 398. Thus, under *Seifert* and *Global Travel*, it is for the court, not the arbitrator, to decide whether an arbitration agreement violates public policy. See *Shotts*, 86 So. 3d at 465.

In reliance on the "Terms & Conditions" of T-Mobile, Arbitrator Reich cited to the text of T-Mobile's terms and conditions for the position that: (1) Plaintiff's claims were barred because Defendant's services was provided on an "as-is" and "with all fault" basis without warranties; (2) Defendant made no warranties as to security, or authentication; (3) Defendant limited liabilities if Plaintiff used the phone line for cryptocurrency account; (4) damages were limited to direct and actual damages; and (5) Defendant could not be held liable for criminal activity by third party. *See* Final Award, 1-2.

Having essentially done not much analysis besides copying the text of the "Terms & Conditions" from T-Mobile's contract, the Arbitrator concluded, "Simply put, these contractual provisions prohibit Claimant from holding Respondent liable for the criminal acts of others regarding accessing, using, or making changes to his account, service, or device, or from recovering the compensatory or punitive damages he seeks for such illegal and unauthorized actions." *Id.* at 2.

Respectfully, if Plaintiff needed someone to recite the contractual language, he did not need to come to a tribunal. This is exactly the type of inadequacy addressed by Justice Stevens in *Mitsubishi*—not only did the Arbitrator commit error in interpreting and applying the limitation-of-liability clause against Plaintiff's statutory remedy, she did not think it was necessary to address the statutes at all.

Arbitrator Reich's analysis completely lack of any legal authorities supporting her reasoning. The Final Award is completely devoid of any law, state or federal, to authorize such a conclusion. Essentially, Arbitrator Reich dispensed her own brand of justice by deciding that (1) Plaintiff contracted for a phone plan, not security, and (2) there is a limitation of liability clause in the contract and hence, she did not need to consider anything beyond this provision. The Arbitrator decided, "the previously discussed provisions in the T&C completed resolve and bar Claimant's claims for relief, it is unnecessary to continue and consider the remaining defenses raised by Respondent, nor is it required to evaluate the various bases proposed by Claimant." *Id.*

As discussed above in *Viking*, simply proceeding under the governance of the FAA does not mean that a party waived his substantive right and remedies. While the FAA encourages enforcement of the arbitration clause, the limitation-of-liability provision is a separate contractual clause that is not enforceable *per se* simply by its existence in the contract at issue. Most importantly, no where in this limitation-of-liability provision did Plaintiff waive his statutorily protected rights and remedies under the FCA. Of note, as Justice Gorsuch discussed in *Carpenter*, a customer's interest in their CPNI could rise to a level of constitutionally protected property interest—no contract can override that fundamental substantive right.

Here, the Arbitrator found that the terms of the T-Mobile user agreement was enforceable even when (1) they served to absolve the carrier from liability for failing to protect the confidentiality

and security of CPNI; which (2) caused a SIM swap and loss of cryptocurrency; while (3) precluding a suit for damages. To allow T-Mobile to directly or indirectly absolve itself of any obligation to protect CPNI from fraudulent SIM swaps would nullify Congress' role in regulating such conduct. The FCC has also long recognized the significant role CPNI. If this Final Award is not vacated, it directly undermines FCC rules and regulations and effectively renders the five-member FCC Board meaningless.

### III. In Light of *Hall Street*, this Court is Still Equipped with the Ability to Independently Adjudicate the Federal claims on the Merits

Having established that the Arbitrator exceeded her power in disregarding Plaintiff's statutory remedies under the FCA, especially with sole reliance on a contractual limitation of liability clause, the next legal issue Plaintiff urges this Court to consider is: Whether, having complied with the arbitration agreement, Plaintiff is entitled to seek this Court's independent adjudication of his claims under the FCA when the Arbitrator has failed to do so?

After the United States Supreme Court's opinion in *Hall Street*, circuit courts have since applied the holding as rule that statutory grounds under the FAA §§ 9-11 provide the exclusive basis for vacatur of an arbitration award. *See Hall St. Assocs., L.L.C. v. Mattel, Inc*., 552 U.S. 576 (2008). The *Hall Street* Court expressly qualified this holding as follows, "But here we speak only to **the scope of the expeditious judicial review** under §§ 9, 10, and 11, deciding **nothing** about other possible avenues for judicial enforcement of arbitration awards." *Id.* at 590 (emphasis added). The Court explained, "The FAA is not the only way into court for parties wanting review of arbitration awards: they may contemplate enforcement under state statutory or common law, for example, where judicial review of different scope is arguable." *Id.*

Meaning, albeit having been applied as a restriction against non-statutory grounds for vacatur, *Hall Street* was never intended to act as that barrier to judicial review of arbitration awards. Discussing *Hall Street*, the Eleventh Circuit emphasized its narrow scope as follows:

> In *Hall Street*, the parties executed an agreement to arbitrate in which they also agreed that the district court could vacate any award if the arbitrator's factual findings lacked evidentiary support or if the arbitrator's legal conclusions were erroneous. The precise issue before the Court was whether the statutory bases for vacatur of an arbitrator's award set forth in § 10 **may be supplemented by contract.**

*Frazier v. Citifinancial Corp., LLC*, 604 F.3d 1313, 1322 (11th Cir. 2010) (emphasis added). Even though the Court answered "no" to the certified question and held that the FAA exclusively governs vacatur, *Hall Street* does <u>not</u> preclude other grounds for judicial review of arbitration awards.

While the *Frazier* did not stray too far from *Hall Street* and held that "judicially-created" basis for vacatur was no longer valid, the current legal landscape does not provide a basis to discharge this Court's jurisdiction to review questions of federal law simply because the parties had complied with an arbitration agreement.

First, it is unquestionable that "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States" 28 USCS § 1331. Plaintiff's claim under the FCA arises under the laws of the United States, over which this Court has original jurisdiction. At this point in the proceeding, the parties have performed in accordance with the arbitration agreement and submitted all claims to the Arbitrator. But when federal question remained and were not addressed by the Arbitrator, this Court retains jurisdiction. *See Badgerow v. Walters*, 596 U.S. 1, 9 (2022) ("If it shows that the contending parties are citizens of different States (with over $75,000 in dispute), then §1332(a) gives the court diversity jurisdiction. Or if it alleges that federal law (beyond Section 9 or 10 itself ) entitles the applicant to relief,

then §1331 gives the court federal-question jurisdiction."). Here, this Court has independent jurisdiction basis to review the underlying substantive claims under the FCA because 47 U.S.C. § 206 entitles Plaintiff to relief. Diversity jurisdiction is also satisfied as established under the "Jurisdiction, Parties, Venue" section.

Second, at the very least, this Court has jurisdiction to decide whether the Final Award has a preclusive effect on Plaintiff's FCA claim. **In *Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. 213 (1985), the U.S. Supreme Court recognized that, "arbitration proceedings will not necessarily have a preclusive effect on subsequent federal-court proceedings."** *Id.* at 223 (discussing *McDonald* v. *West Branch*, 466 U.S. 284 (1984)); *see also Dimenstien v. Whiteman,* 759 F.2d 1514 (11th Cir. 1985) (relying on *Dean Witter* for the position that the collateral estoppel effect of an arbitration proceeding only arises after the completion of arbitration.).

On the face of the Final Award, the Arbitrator did not rule on the merits of the FCA claims because she decided that her analysis stopped after a reading of the Limitation of Liability clause. Such an approach cannot trigger issue preclusion because the Arbitrator did not make any specific findings of fact and conclusions of law as to why the contractual Limitation of Liability clause could override Plaintiff's statutory remedy.

To keep it succinct, Plaintiff will only briefly address this point, pending this Court's determination as to whether it will conduct independent adjudication of the matter. "Federal law requires the following four elements to invoke issue preclusion: (1) the issue at stake must be identical to the one decided in the prior action; (2) the issue must have been actually litigated in the prior proceeding; (3) the prior determination of the issue must have been a critical and necessary part of the earlier decision; and (4) the standard of proof in the current action must not

be significantly more stringent than the standard in the prior action." *Bush v. Balfour Beatty Bahamas, In re Bush*, 62 F.3d 1319, 1322 (11th Cir. 1995).

Here, the issue is whether Plaintiff's claim under the FCA could be discharged by a limitation-of-liability clause. While the Arbitrator touched on this point, she did nothing more than reciting the contractual language then arrived at a bare legal conclusion: "Simply put, these contractual provisions prohibit Claimant from holding Respondent liable for the criminal acts of others regarding accessing, using, or making changes to his account, service, or device, or from recovering the compensatory or punitive damages he seeks for such illegal and unauthorized actions." This conclusion attempted to shield Defendant from liability and discard Plaintiff's right to recover damages without any legal bases. The Arbitrator did not address Plaintiff's federal claim whatsoever. Hence, the issue was not properly "litigated" in arbitration. Plaintiff intends to brief this issue further upon leave of this Court to address the merits of his claims separate from the Final Award.

Arbitrator Reich's Final Award contravenes public policy; it clearly evidences a corruptive pattern of companies exerting private control over legal remedies. Where judges have the ability to exercise impartial judgment the corporations select the arbitrators. The corporations are privy to the track record of an arbitrator whereas the consumers are not. Ruling against a corporation could effectively blacklist an arbitrator from being considered for future business. T-Mobile escapes liability for violations of law simply by including a generic limitation-of-liability clause and an arbitration clause in its service contracts. Unassuming consumers, limited in choices and finances, are forced to accept these terms and conditions imposed by the carrier.

WHEREFORE, it is requested that this Honorable Court vacate the arbitration award dated April 24, 2024, Case Number: 01-22-0001-1162, Edward Mendez v. T-Mobile USA, Inc., accept

jurisdiction to adjudicate the FCA claim, and grant any further relief that the Court deems just and proper.

## GOOD FAITH CERTIFICATE

Pursuant to Florida Southern District local rule 7.1(3), Plaintiffs assert the only party or non-party affected is T-Mobile. Counsel for the movant conferred in good faith on May 23, 2024 and June 6, 2024 to come to an agreement on what should be filed under seal. On July 2, 2024, an inquiry was made to T-Mobile if they would agree to the relief sought herein, to seek to vacate the Final Award, to which T-Mobile declined.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and complete copy of this document was electronically filed with the Southern District of Florida on the 8th day of July 2024.

Respectfully submitted,

Shrayer Law Firm, LLC.
912 South Andrews Avenue
Fort Lauderdale, FL 33316
Tel.   (954) 601-3732
Email:ghs@shrayerlaw.com

**/s/   Glen H. Shrayer_____**
 Glen H. Shrayer, Esq.
 FL Bar No. 57253